# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **NORTHSTAR MARINE, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 13-0037-WS-C |
| | ) |
| **MICHAEL HUFFMAN, *et al.*,** | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 52). The Motion has been briefed and is now ripe for disposition.

**I. Factual Background.**

This action arises from a commercial dispute between two entities that were involved in the lucrative business of cleaning up the Gulf of Mexico oil spill caused by the explosion of the DEEPWATER HORIZON drilling platform in April 2010.[1]

Everyone agrees that non-party National Recovery Corporation ("NRC") entered into a contract with BP Oil Corporation to provide boats, operators, equipment, and manpower for the massive oil-spill remediation project. (Doc. 66, at 1; doc. 73, at 2.) In turn, NRC entered into direct written contracts with a number of vendors to provide vessels, materials and labor for the job. (Doc. 66, at 2; doc. 73, at 2.) One such company that contracted directly with NRC to

---

[1] The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in its favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in [its] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

provide boats and services for the clean-up effort was plaintiff, Northstar Marine, Inc. ("Northstar"). (Eilers Dep., at 4.) Northstar's arrangement with NRC was that it "would provide any labor, services and equipment that they requested in accordance with [Northstar's] time and material rate sheet." (Risko Dep., at 5.)[2] To help meet NRC's vast needs for the remediation project in the Gulf of Mexico, Northstar deployed approximately 20 of its own boats (all or substantially all of Northstar's fleet) and 20 of its approximately 40 employees to the Gulf for this job. (*Id.* at 6-7.)

Notwithstanding these activities, NRC's requests for boats, equipment and personnel to assist with the oil-spill clean-up far outstripped Northstar's finite resources; indeed, Northstar "had been continually requested by NRC to add more boats and more manpower." (*Id.* at 8.) To accommodate this insatiable demand, Northstar retained an estimated 50 subcontractors to provide labor, boats, and specific equipment to go on the boats for the oil spill project. (*Id.* at 7-8.) One such subcontractor that Northstar hired was defendant Huffman Construction, Inc. On May 26, 2010, Northstar and Huffman Construction entered into a written "Agreement to Provide Response Resources," which specified that Huffman Construction would furnish personnel, equipment, supplies and other response resources to Northstar in exchange for compensation at 85% of Northstar's published rates on the accompanying rate sheet. (Doc. 81, Exh A. at 1-8.)[3] The May 26 Agreement expressly provided that "[n]o additional compensation or commission will be provided to contractor." (*Id.* at 7.)[4] On its face, the May 26 Agreement was made in, and governed by the law of, the State of New Jersey, where Northstar is headquartered. (*Id.* at 3.)

---

[2] A copy of Northstar's rate sheet effective April 1, 2010 is found in the summary judgment record. (*See* doc. 81, Exh. A at 8.) Although specific pricing details are not crucial to this dispute, examples of line items appearing on the rate sheet are that Northstar charged $55.00 per hour for a marine spill technician, $200.00 per day for a pollution response trailer, and $3,000 per day for a 45-foot tugboat. (*Id.*)

[3] Northstar then billed NRC for those services at 100% of the published rates, with the difference representing profit to Northstar. (Risko Dep., at 26-27.)

[4] With regard to potential modifications, the May 26 Agreement included language that "[n]o amendment of this Agreement shall be effective or binding unless in writing and executed by both Northstar and Contractor's respective duly authorized representatives." (*Id.* at 3.)

What happened next is a subject of vehement disagreement by the parties, and lies at the heart of this lawsuit. In the light most favorable to Northstar (as the non-movant on summary judgment), the sequence of events was as follows: "NRC called [Northstar] in or around the middle of June and requested even more manpower and boats." (Risko Dep., at 8.) Unfortunately, Northstar's office was "maxed out" in its ability to process subcontractors at that time, and was simply unable to provide the additional resources to NRC. (*Id.* at 8-9.)

Northstar's solution to this dilemma was to recommend one of its subcontractors to enter into a direct contract relationship with NRC. Within 24 hours of NRC's request for additional resources, Northstar's president and owner, Phil Risko, contacted Huffman Construction's president, defendant Michael Huffman ("Huffman"), via cell phone. (Risko Dep., at 21.)[5] Risko informed Huffman that he was calling about the possibility of Huffman Construction "doing work directly for NRC." (*Id.*) "And then [Risko] spoke to NRC and … they were very interested to move forward with hiring Huffman directly so long as he could provide the suitable insurance and sign the contract that they would require." (*Id.*) Risko explained to Huffman that this arrangement "would just be something separate to our original agreement … and that as compensation for getting him the work directly and recommending him for it, that … Northstar would be requesting 10 percent of the gross amount that was billed and paid." (*Id.* at 21-22.) Huffman responded, "That would be fine." (*Id.* at 22.)[6] Risko proposed to NRC that they

---

[5] At that time, Risko was at Northstar's office in Mobile, Alabama, while Huffman was in Cocodrie, Louisiana, overseeing subcontractor work for the BP oil-spill project that Huffman Construction was providing to Northstar pursuant to the May 26 Agreement. (*Id.* at 21, 23.) Thus, Huffman Construction was performing the May 26 Agreement on location in coastal Louisiana.

[6] For his part, Huffman categorically denies that such a conversation ever took place. Defendants' position is that Risko's testimony on this point is pure fabrication. Huffman's testimony is emphatic that "I never said anything about 10 percent to anyone" and that "it wasn't until after that, a long time, … that's when the whole 10 percent thing came up." (Huffman Dep., at 9, 12, 24.) The Court makes no credibility determinations in this Rule 56 analysis, but instead must accept the record facts in the light most favorable to the non-movant, Northstar. In this case, the record contains ample evidence from which a finder of fact could conclude that this conversation did occur, including Risko's testimony and corroborating evidence from other witnesses. For example, a witness named Halley Ray Moor, Jr., testified to attending a dinner meeting with Huffman and a person named Rian Glasscock a few days later, in which the terms of the deal were spelled out that "10 percent of the gross was to go to Northstar Marine." (Moor Dep., at 17.) In a subsequent letter, Moor expressly referenced the
(Continued)

contract directly with Huffman Construction, and touted Huffman Construction to NRC as "a provider who's doing a good job and they have more resources they can bring in." (*Id.* at 10.) Risko then put NRC in contact with Huffman to finalize their arrangements, and spoke to both NRC and Huffman "throughout the process … to make sure everybody was on the same page, that the arrangement was going to be beneficial to everybody and everybody was okay with it." (*Id.*)

For better or worse, the 10% fee arrangement to which Northstar and Huffman Construction had agreed was never memorialized in writing. Plaintiff's evidence is that Northstar did not insist on a written agreement because Northstar was "so overwhelmed" with its workload at the time, because Risko trusted the person who had recommended Huffman Construction to him, and because Northstar had "done various contracts of a similar nature over the years and never had a problem." (Risko Dep., at 23-24.) This time, however, Northstar's luck ran out. Notwithstanding the oral agreement for a 10% fee, Northstar received no payments from Huffman Construction. In September 2010, Risko became concerned that no such payments had been forthcoming, so he made telephonic inquiry to Huffman. In response, Huffman acknowledged that he owed Northstar the money, but asked for a credit for the $200,000 that Northstar owed Huffman Construction for services provided on the May 26 subcontractor agreement. (*Id.* at 30.) Risko assented. (*Id.*)[7] In October 2010, Risko called again, and Huffman "said he was waiting for payment from NRC." (*Id.*) Huffman reiterated that explanation in November 2010 when Risko called him a third time. (*Id.*) After that, Risko

---

10% fee being discussed at the meeting, and indicated that Huffman "said he would take the contract on these terms." (Doc. 73, Exh. E, at 1.) Risko testified that Huffman acknowledged several months later, "I know I owe you the money" for the 10% fee. (Risko Dep., at 30.) Defendants' position is that Risko is a liar and that Moor and Glasscock are not credible because they have an axe to grind against Huffman Construction and Huffman, against whom they have initiated their own, related lawsuit. Notwithstanding these potential witness challenges, Northstar's evidence must be credited for summary judgment purposes, even over Huffman's forceful denial that any such dialogue or agreement ever happened.

[7] In his deposition, Risko was asked whether he contested that Northstar owed Huffman Construction the sum of $200,000 for an unpaid invoice on the written subcontractor agreement for labor and materials provided by Huffman Construction on the oil-spill remediation project. Risko responded, "No, I agreed to that." (*Id.*)

placed numerous further calls to Huffman, who neither accepted nor returned them. (*Id.*) This is so, even though Huffman Construction admittedly took in gross receipts of between $10 million and $14 million on the BP oil-spill remediation project. (Huffman Dep., at 12-13.) This lawsuit followed.

Northstar's Complaint (doc. 1) against Huffman and Huffman Construction alleges causes of action for breach of contract, unjust enrichment, conversion, and fraud, negligent and/or reckless misrepresentation. Northstar demands an award of compensatory damages of $1 million (which equates to the agreed-upon 10% finder's fee applied to $10 million in gross receipts) against both defendants, jointly and severally, plus punitive damages on the fraud/misrepresentation claim. Defendants' Answer (doc. 12) interjects the following purported affirmative defenses: (i) the Complaint fails to state claims upon which relief can be granted; (ii) the Complaint is not subject to admiralty and maritime jurisdiction;[8] (iii) lack of personal jurisdiction over defendants; and (iv) improper venue. (Doc. 12, at 1.) Defendant Huffman Construction also brought a Counterclaim (doc. 16) against Northstar, alleging a single state-law cause of action based on allegations that Northstar owes Huffman Construction money for labor and materials provided under the parties' written subcontract agreement. According to the Counterclaim, "Northstar has failed and refused to pay to Huffman Construction the due balance for its services in the amount of $408,083.45," plus interest, attorney's fees and costs. (Doc. 16, ¶ 7.)

Defendants now move for summary judgment on several aspects of this litigation. First, they challenge the existence and enforceability of the alleged oral agreement for Huffman Construction to pay a 10% finder's fee to Northstar. Second, they seek dismissal of all claims against Michael Huffman individually (as opposed to those against Huffman Construction).

---

[8] Notwithstanding defendants' challenge to admiralty jurisdiction, there can be no reasonable dispute as to the propriety or legitimacy of federal subject matter jurisdiction over this action. Even if admiralty jurisdiction were lacking, the Complaint effectively pleads an alternative jurisdictional theory of diversity, pursuant to 28 U.S.C. § 1332. The plain allegations of the Complaint reflect that there is complete diversity of the parties (with Northstar being a New Jersey citizen and both defendants being Indiana citizens) and that the amount in controversy far exceeds the $75,000 jurisdictional minimum. (*See* doc. 1, ¶¶ 1-3, 5.) By all appearances, then, federal subject matter jurisdiction properly lies, irrespective of whether this case is or is not within the boundaries of admiralty jurisdiction.

Third, defendant Huffman Construction moves for summary judgment as to liability on its counterclaim against Northstar. Plaintiff opposes all such grounds for Rule 56 relief. Each component of defendants' Motion for Summary Judgment will be considered in turn.

## II.     Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.    Analysis.

### A.     *The Alleged Oral Contract.*

Defendants contend that they are entitled to summary judgment because there was no valid, enforceable agreement between Northstar and Huffman Construction for the 10% finder's fee. Embedded in this assertion are three distinct sub-arguments, to-wit: (i) the legal elements of an oral contract were not present; (ii) even if an agreement for the 10% finder's fee did exist, it was unenforceable, pursuant to Alabama's Statute of Frauds; and (iii) the oral nature of the agreement rendered it an improper, unenforceable amendment to the parties' previous written "Agreement to Provide Response Resources" dated May 26, 2010.

## 1. *Whether the Legal Elements of a Contract Existed.*

It is hornbook law that "[a] contract cannot be formed without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract." *Ex parte Payne*, 741 So.2d 398, 403 (Ala. 1999). Defendants assert that Northstar's claims must be dismissed because "[t]here is no substantial evidence of an offer, an acceptance, consideration and mutual assent." (Doc. 66, at 19.) Review of the summary judgment record in the light most favorable to the non-movant reveals otherwise.[9]

Accepting Northstar's evidence as true, and construing all reasonable inferences in Northstar's favor, a reasonable finder of fact could conclude that Northstar's president, Phil Risko, contacted Huffman with a proposal of referring Huffman Construction to NRC as a direct contractor in exchange for Huffman Construction paying Northstar 10% of its gross receipts on that contract. A reasonable finder of fact could also conclude that Huffman (on behalf of Huffman Construction) assented to this proposal, that Risko then recommended Huffman Construction to NRC and placed NRC in contact with Huffman Construction to finalize their arrangements, and that Risko worked with Huffman and NRC throughout the process to make sure it went smoothly and met with all participants' satisfaction. These facts demonstrate all of the elements of contract formation: offer, acceptance, consideration, and mutual assent to essential terms.

In arguing otherwise, defendants effectively turn the summary judgment standard on its head, by urging the Court to accept their evidence and to discard Northstar's.[10] For example,

---

[9] In making this argument, defendants cite repeatedly to page 9 of the deposition of Chris Eilers. (Doc. 66, at 19-20.) That page is not part of the summary judgment record (*see* doc. 81) and the undersigned cannot accept counsel's *ipse dixit* as to the contents of that document.

[10] Strikingly, defendants posit that "[w]here a party challenges the very existence of a contract, as Huffman has done in the case at bar, the dispute must be decided by the Court." (Doc. 66, at 24.) However, the authorities cited by defendants for this proposition are inapposite, because they relate not to summary judgment, but to the qualitatively different issue of whether a court or an arbitrator should decide the existence of an arbitration agreement. *See Shearson Lehman Bros., Inc. v. Crisp*, 646 So.2d 613, 616-17 (Ala. 1994) ("[A] party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the *existence* of an agreement to arbitrate. Only a court can make that decision."). Defendants' suggestion that courts are tasked on summary judgment with deciding which side's version of the facts to believe, so long as the factual dispute relates to contract
(Continued)

defendants argue that "there is no substantial evidence of an offer" because "[t]he only evidence consists of alleged phone calls between Risko and Huffman which Huffman denies even occurred." (Doc. 66, at 22.) But Risko testified that those telephone conversations did take place, and his testimony constitutes "substantial evidence" that creates a genuine issue of material fact for summary judgment purposes, no matter how vigorously Huffman disputes its veracity.[11] Similarly, defendants' position that the contract fails for lack of consideration because "Northstar did nothing to insure that Huffman Construction got the contract from NRC" (*id.*) ignores Risko's unambiguous testimony to the contrary, and effectively asks the Court to credit other witnesses' testimony instead. This would be improper in the summary judgment context. Elsewhere, defendants' assertion that "[t]here is no evidence of any act by Huffman Construction showing the assent to the alleged oral contract between Huffman Construction and Northstar" (*id.* at 24) is unavailing because it disregards Risko's testimony describing just such express, affirmative assent by Huffman Construction (via its agent, Huffman).[12]

---

formation, lacks any legal foundation. *See generally Prince v. Poole*, 935 So.2d 431, 442 (Ala. 2006) ("A summary judgment in Poole's favor on his breach-of-contract claim is appropriate only if there is no disputed issue of material fact with respect to … the existence of a valid contract binding the parties in the action ….") (citation omitted); *Lockheed Martin Corp. v. Galaxis USA, Ltd.*, 222 F. Supp.2d 1315, 1343 (M.D. Fla. 2002) ("The existence of remaining issues of fact as to the parties' intent to form a guaranty contract precludes the entry of summary judgment in favor of either [side]."); *Federal Paper Bd. Co. v. Harbert-Yeargin, Inc.*, 92 F. Supp.2d 1342, 1350 (N.D. Ga. 1998) ("As there are material facts in dispute concerning the assent of the parties to the terms of the contract, neither plaintiff nor defendant is entitled to summary judgment on the issue of whether the parties entered into a valid and enforceable contract.").

[11]     To support their position that Risko's testimony is inadequate to establish the existence of a contract, defendants postulate that for a contract to exist, "[t]he Court must not be left by the proof to be in doubt, to have uncertainty or to have to infer as to the contract or as to the terms, conditions and amount of consideration of the contract." (Doc. 66, at 23.) However, if Risko's testimony is believed (as it must be for summary judgment purposes), then the requisite clarity is present as to both the contract's existence and its terms. That defendants may plan to use other evidence to discredit Risko's narrative at trial is not a viable basis for rejecting his clear testimony at the summary judgment stage as inadequate to give rise to genuine issues of fact as to contract formation.

[12]     Defendants' other contentions in this vein may be quickly dispatched. Defendants argue that certain of Northstar's witnesses testified differently about the alleged agreement
(Continued)

Summary judgment is not an exercise in wishing away adverse evidence, or in prevailing upon the judge to pick and choose which side's version of the facts is more believable. Defendants' arguments proceed in derogation of these principles. On the record before this Court, clear issues of material fact remain as to whether Northstar and Huffman Construction did or did not enter into an oral agreement under which Huffman Construction agreed to pay Northstar 10% of its gross receipts from the NRC contract in exchange for Northstar's actions to recommend Huffman Construction for said contract and facilitate same.

## 2. *Whether the Contract was Barred by the Statute of Frauds.*

As a separate basis for seeking summary judgment, defendants assert that "[p]ursuant to Alabama's Statute of Frauds, the alleged oral contract is void as it cannot be performed within one year." (Doc. 66, at 17.) Under Alabama law, "[e]very agreement which, by its terms, is not

---

between Northstar and Huffman Construction than Risko did. (Doc. 66, at 24.) However, defendants do not show that such discrepancies are material. Besides, any such divergence in the narrative of Risko and other defense witnesses may be effective fodder for cross-examination or undermining Risko's veracity at trial, but it does not provide a viable basis for summarily sweeping aside Risko's testimony at the Rule 56 stage. Next, defendants protest that it is "illogical" that Northstar would enter into such an agreement with Huffman Construction, then fail to take various follow-up measures that defendants think it should have taken. (*Id.* at 25.) This is an argument attacking the credibility of Risko's testimony, which again is improper and impermissible on summary judgment review. Elsewhere, defendants challenge the timing of Northstar's recommendation to NRC *vis a vis* Huffman Construction's assent to the alleged oral agreement. In defendants' view, "Risko had ***already recommended*** Huffman Construction to NRC when Risko claims to have contacted Huffman and proposed his purported 'deal.'" (Doc. 78, at 3 (emphasis in original).) But the cited pages from Chris Eilers' deposition do not support this statement (and one such cited page is missing from defendants' evidentiary submission). Also, while Risko's testimony is not a model of clarity as to sequence of events, it supports a reasonable inference that the timing of these events was not as alleged by defendants, and that Northstar took substantial, tangible steps to assist Huffman Construction in obtaining the NRC contract after the 10% deal was reached. Finally, defendants' insistence that "[t]he only people that would know if there were a conversation and agreement are Risko and Huffman, and Huffman denies that there was a conversation and agreement" (doc. 78, at 5-6) misses the point of summary judgment. As long as Risko testified that there was such a conversation and agreement (which he did), then Huffman's dispute of that fact is functionally irrelevant in the summary judgment context. It does not and cannot entitle defendants to Rule 56 relief. Simply put, while defendants' assertions may or may not prove meritorious at trial, none of them entitle defendants to entry of summary judgment or dispel the clear presence of genuine issues of material fact as to contract formation.

to be performed within one year from the making thereof" is void unless such agreement is in writing. Ala. Code § 8-9-2(1). Defendants' position is that the alleged oral agreement obligating Huffman Construction to pay a 10% finder's fee to Northstar is void and unenforceable pursuant to § 8-9-2(1). There are at least two fatal defects with this ground for summary judgment relief.

First, it is black-letter law that the statute of frauds is an affirmative defense that must be pleaded by the defendant. *See, e.g., Hughes v. Wallace*, 429 So.2d 981, 983 (Ala. 1983) (explaining that "the statute of frauds is an affirmative defense which must be specially pleaded" and that a defendant's "failure to do so constitutes a waiver of that defense"); *Nichols v. Pate*, 54 So.3d 398, 402 (Ala.Civ.App. 2010) ("The Statute of Frauds is an affirmative defense that is waived if not pleaded."). As Northstar correctly points out, defendants did not plead the affirmative defense of statute of frauds in their Answer, nor did they attempt to amend their Answer to add that defense until almost a year after the scheduling order deadline for motions to amend pleadings. Northstar objected to the proposed amendment as untimely. Through a pair of Orders (docs. 71 & 76) entered on July 28, 2014 and August 8, 2014, this Court denied defendants' untimely efforts to plead the statute of frauds, for failure to meet the "good cause" standard imposed by Rule 16(b)(4), Fed.R.Civ.P., for modification of the scheduling order. As such, the statute of frauds defense has not been properly joined in this litigation, and cannot support defendants' Motion for Summary Judgment.

Second, even if Huffman Construction had not waived the statute of frauds defense by failing to plead it in its Answer, summary judgment would remain inappropriate because Huffman Construction has not proven that the alleged agreement falls within the parameters of § 8-9-2(1). Decisional authority is crystal clear that "in order to bring a contract within the purview of § 8-9-2(1), the contract **must be incapable of being performed within one year**." *Williams v. Hill*, 17 So.3d 229, 233 (Ala.Civ.App. 2009) (emphasis added); *see also Hornady v. Plaza Realty Co.*, 437 So.2d 591, 593 (Ala.Civ.App. 1983) (similar). The Alabama Supreme Court has clarified that "[a] contract is not brought within the statute by the fact that the full performance within a year is highly improbable, nor by the fact that the parties may not have expected that the contract would be performed within the year." *Land v. Cooper*, 34 So.2d 313, 317 (1948) (citation omitted). Rather, for an oral contract to be struck down by § 8-9-2(1), "there must be a negation of the right or possibility to perform it within a year, that is, by its terms it is not to be or is incapable of being so performed." *Land*, 34 So.2d at 317.

To bolster its contention that the alleged agreement for the 10% finder's fee is void under the Statute of Frauds, Huffman Construction relies on evidence that NRC made payments to Huffman Construction for more than a year. (Doc. 81, Exh. G.) Thus, defendants reason that the NRC/Huffman Construction contract actually was performed for more than a year, so any 10% payment obligation that Huffman Construction might have owed to Northstar likewise would have lasted more than a year (because those 10% fees were derivative of NRC contract payments to Huffman Construction). However, this is not the right inquiry. Whether the alleged Northstar / Huffman Construction contract actually lasted more than a year is irrelevant for § 8-9-2 purposes. As demonstrated by the foregoing authorities, the proper question is whether that agreement was incapable of being performed within a year. That performance of the agreement turned out to run for longer than a year is not dispositive of whether such agreement was incapable of being performed within a year; therefore, the duration of the payment stream from NRC to Huffman Construction is not decisive as to application of the Statute of Frauds.

Nor do defendants demonstrate entitlement to summary judgment by stating that the NRC / Huffman Construction contract was nominally for a period of five years. (Doc. 81, Exh. D.) In fact, the language of the NRC / Huffman Construction agreement cuts against defendants' Statute of Frauds argument. To be sure, that agreement specifies that it "shall continue in full force and effect for a period of five (5) years from the date hereof." (*Id.* at § 8.1.) But it also provides that Huffman Construction "shall be entitled to terminate this Agreement for any reason on ninety (90) days written notice to NRC." (*Id.* at § 8.3.) In other words, Huffman Construction was free to terminate its agreement with NRC at any time (even during that initial year) and for any reason on 90 days' notice, thereby creating a possibility that the NRC / Huffman Construction agreement (and, hence, the Northstar / Huffman Construction contract for a 10% fee on payments made under the NRC / Huffman Construction agreement) could be performed within a year. *See Abbott v. Hurst*, 643 So.2d 589, 593 (Ala. 1994) (opining that "a contract subject to an express contractual right of termination by either party within one year is not within the Statute [of Frauds], even though by its own terms it cannot otherwise be performed within one year").[13]

---

[13] Another way to reach the same conclusion is this: Just because NRC had entered into a direct contract with Huffman Construction for a period of five years does not necessarily (Continued)

Simply put, the Statute of Frauds affirmative defense has not been properly joined in this lawsuit. Even if it had, defendants have not shown that there was no possibility that the Northstar / Huffman Construction contract could be performed within a year. Accordingly, defendants' request for summary judgment on Statute of Frauds grounds is unpersuasive and unavailing.[14]

### 3. *Whether the Contract was an Invalid Amendment to a Prior Agreement.*

As an alternative ground for summary judgment, defendants assert that Northstar's claims predicated on the alleged oral agreement for a 10% fee fail as a matter of law because such agreement is an invalid amendment to the parties' earlier contract. Recall that Northstar and Huffman Construction had entered into a written "Agreement to Provide Response Resources" on May 26, 2010, pursuant to which Huffman Construction provided labor and equipment to assist Northstar in complying with NRC's ongoing requests for response resources to conduct the oil spill clean-up. The May 26 Agreement specified that "[n]o amendment of this Agreement shall be effective or binding unless in writing and executed by both Northstar and" Huffman

---

mean that NRC would call on Huffman Construction to provide boats, equipment and labor throughout that five-year period. Nothing in that contract required NRC to request resources from Huffman Construction continually for that entire five-year period. Thus, it was possible (perhaps not likely, but possible) that NRC might not request any response resources from Huffman Construction after the first year (such as, for instance, if the DEEPWATER HORIZON project wrapped up quickly and response resources were no longer needed by NRC), and that Huffman Construction would not receive any payments from NRC after the first year. In that circumstance, there would be no 10% payments owed by Huffman Construction to Northstar after the first year, that oral agreement would have been fully performed within one year, and the Statute of Frauds would be inapplicable. Defendants do not explain why these potential scenarios were impossible, much less how they would not operate to remove the subject agreement from the ambit of Alabama's Statute of Frauds.

[14]  At most, defendants' evidence on summary judgment suggests that it was unlikely that the purported Northstar / Huffman Construction contract would be performed within a year. However, that is not the applicable test. *See, e.g., Quimby v. Memorial Parks, Inc.*, 667 So.2d 1353, 1356 (Ala. 1995) ("while it may not have been likely that the contract in this case would have been performed within one year the contract and the circumstances did not preclude its performance within one year; thus a jury question is presented"); *W.P. Brown & Sons Lumber Co. v. Rattray*, 192 So. 851, 855 (Ala. 1939) ("the statute does not mean to include an agreement which is simply not likely to be performed, nor yet one which is simply not expected to be performed within the space of a year from its making") (citation omitted).

Construction. (Doc. 81, Exh. A, at 3 ¶ 18.) Defendants now argue that this clause from the May 26 Agreement renders the alleged mid-June 2010 oral agreement concerning the 10% fee ineffective and non-binding.

It is undisputed that, as a general proposition, contract clauses mandating that all amendments be in writing are enforceable. The difficulty with defendants' argument, however, is that it presupposes that the subsequent oral agreement for a 10% finder's fee was an amendment to the May 26 Agreement. The record demonstrates that genuine issues of fact remain on this question. For starters, Risko testified that he and Huffman expressly discussed in mid-June that the 10% arrangement "would just be something separate to our original agreement." (Risko Dep., at 21-22.) Moreover, the contract language can be reasonably read to support this view. Recitals set forth in the May 26 Agreement frame the purposes of that contract as follows: "Northstar desires to expand its access to responses [*sic*] resources by establishing subcontractor agreements" and Huffman Construction "has agreed to make available to Northstar the Specified Resources, subject to the terms and conditions of this Agreement." (Doc. 81, Exh. A, at 1.) By contrast, the mid-June oral agreement did not involve Huffman Construction making response resources available to Northstar, did not relate to the subcontractor relationship, and did not affect compensation owed to Huffman Construction under the pre-existing subcontractor arrangement. Viewed in that light, the oral agreement did not purport to alter the terms and conditions of that earlier subcontractor agreement in any way, shape or form.

In short, a reasonable finder of fact could conclude on this record that the oral agreement relating to the 10% finder's fee was not an amendment of the May 26 Agreement because it concerned entirely different subject matter and was, as Risko put it, "something separate." For that reason, summary judgment is not appropriate on defendants' contention that the alleged oral agreement is rendered void under the earlier written contract's clause that all amendments to same must be in writing.

### B. *The Claims Against Michael Huffman Individually.*

Defendants also move for summary judgment as to all claims against defendant Michael Huffman, as distinguished from the corporate defendant, Huffman Construction, Inc. In defendants' view, "[t]here is no evidence in any document produced in evidence or through testimony in any deposition that would establish individual liability on the part of Huffman."

(Doc. 66, at 27.) Defendants' point is straightforward: All allegations and claims set forth in the Complaint refer to alleged acts and omissions of Huffman Construction, relating to a contract purportedly entered into between Huffman Construction and Northstar. The Complaint does not expressly identify Michael Huffman, individually, as a party to any contract that Northstar claims was breached and for which Northstar seeks recompense herein.

In response to this direct challenge, plaintiff does not point to any facts suggesting that Michael Huffman personally was a party to the alleged oral contract. Nor does Northstar identify any alleged wrongful acts or omissions by Huffman individually that might support its claims against him (as opposed to those against his company) in this lawsuit. Instead, Northstar succinctly sets forth its theory of liability as to Huffman individually, as follows: "Michael Huffman bears liability along with Huffman Construction, Inc., due to his failure to follow any of the required corporate formalities and to observe any separation between himself and the corporation." (Doc. 73, at 1.) That is to say, Northstar seeks to hold Michael Huffman liable in this action solely by piercing the corporate veil of Huffman Construction, Inc., in order to reach Huffman personally. (*Id.* at 7-8.)

It is well settled that, while the corporate form is not lightly disregarded, "[t]he veil separating corporations and their shareholders may be pierced in some circumstances" to impose individual liability. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003).[15] As defendants correctly point out, the trouble with Northstar's announcement in summary judgment briefing that its claims against Michael Huffman are rooted in a "piercing the corporate veil" theory is that its pleadings are devoid of any such notion. (*See* doc. 78, at 9-11.) Review of the Verified Complaint (doc. 1) reveals no allegation connecting Michael Huffman to Huffman Construction, Inc., much less championing principles of piercing the corporate veil. Indeed, the Complaint's sole allegation referencing Huffman himself is that

---

[15] *See also M & M Wholesale Florist, Inc. v. Emmons*, 600 So.2d 998, 999 (Ala. 1992) ("In order to recover against an individual for the debts of a corporation, the plaintiff must show (1) that the individual agreed to be liable for the debts; or (2) that the facts surrounding the transaction support a disregard for the corporate form."); *Cohen v. Williams*, 318 So.2d 279, 281 (Ala. 1975) ("In a proper case, when the corporate form is being used to evade personal responsibility this court has not been hesitant to disregard the corporate form and impose liability on the person controlling the corporation and subverting it to his personal use by the conduct of its business in a manner to make it merely his instrumentality.").

"[u]pon information, Defendant Michael Huffman, is a citizen of Indiana, with a residence in Warren, Indiana." (Doc. 1, ¶ 2.) Aside from that solitary instance, plaintiff lumps both defendants together throughout the Complaint, referring to them collectively as "Defendants," without separating out the acts and omissions of one from the acts and omissions of the other. Certainly, nothing in the Complaint specifies Northstar's designs on a "piercing the corporate veil" path to liability for Michael Huffman, much less sets forth any facts or allegations of any kind that might lend support to same.

Abundant authority crisscrossing a broad swath of jurisdictions holds that a plaintiff wishing to pierce the corporate veil to hold a particular defendant liable must set forth that intention in the complaint, and must do so in a manner that, at a minimum, satisfies the notice pleading requirements of Rule 8(a), Fed.R.Civ.P. *See, e.g., Sudamax Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp.2d 841, 847 (W.D. Ky. 2007) (under Kentucky law, "[a] theory of liability that the corporate veil should be pierced must be plead in the complaint").[16]

---

[16] *See also Accurso v. Infra-Red Services, Inc.*, --- F. Supp.2d ----, 2014 WL 2218128, *11 (E.D. Pa. May 28, 2014) (applying Pennsylvania law and concluding that while "veil-piercing is not a separate cause of action, but rather a basis for a cause of action against particular individuals," complaint must plead sufficient facts to "state a cause of action on a theory of piercing the corporate veil") (citations omitted); *Laborers' Pension Fund v. Lake City Janitorial, Inc.*, 758 F. Supp.2d 607, 618 (N.D. Ill. 2010) (applying Illinois law to conclude that, while piercing the corporate veil is "a means of imposing liability on an underlying cause of action, one who seeks to have the courts apply an exception to the rule of separate corporate existence must seek that relief in his pleading") (citation and internal markings omitted); *Raber v. Osprey Alaska, Inc.*, 187 F.R.D. 675, 679 (M.D. Fla. 1999) ("Under Florida law, the corporate veil will not be pierced unless the party requesting that the corporate veil be pierced pleads instrumentality and improper conduct.") (citations and internal quotation marks omitted); *Phoenix Energy Sales Co. v. Goodman*, 960 F. Supp. 1253, 1256 (E.D. Mich. 1997) ("[I]t cannot be said that Carmody or Goodman were on notice that Phoenix is attempting to utilize the doctrine of 'piercing the corporate veil' as a basis of liability against them. Therefore, this court finds that plaintiff's complaint sets forth no claims against defendants Carmody or Goodman on the basis of … improper use of the corporate form which would permit plaintiff to 'pierce the corporate veil.'"); *Quinn v. Workforce 2000, Inc.*, 887 F. Supp. 131, 135 (E.D. Tex. 1995) (concluding under Texas law that the "basis for disregarding the corporate fiction … is an independent ground of recovery that must be specifically pleaded or waived") (citations omitted); *First Nat'l Bank of Louisville v. Lustig*, 809 F. Supp. 444, 446 (E.D. La. 1992) ("The complaint contains no allegation that Federal is the alter [e]go of Chubb & Son, or that the corporate veil should be pierced. … these allegations are insufficient to state a claim for alter ego (Continued)

Defendants are correct that nothing in Northstar's Complaint would reasonably have placed Michael Huffman on notice that the claims against him were rooted in a theory of piercing the corporate veil, much less identified any supporting factual allegations. A reasonable plaintiff reviewing the Complaint would have no reason to believe that veil-piercing was at issue in this case.[17] Even under liberal notice-pleading standards, piercing the corporate veil is not pleaded in the Complaint. Courts around the country have consistently, emphatically required that a veil-piercing claim or theory of liability must be presented in the plaintiff's pleading in some form or fashion. Northstar did not do so. Of course, a summary judgment brief is not a

---

status …."); *In re Fields*, 449 B.R. 387, 400 (Bankr. D. Minn. 2011) (applying Minnesota law and concluding that where complaint "does not even suggest that the Plaintiff was seeking to have individual liability imposed on the Defendant on a pass-through basis, … the theory of liability is not before the Court, and the Plaintiff has no right to maintain suit on it going forward"); *In re Shore to Shore Realty Inc.*, 2011 WL 350526, *5 (Bankr. E.D.N.Y. Feb. 1, 2011) ("Whether it is a cause of action or a remedy, the pleadings must contain the claim that piercing the corporate veil is appropriate and must outline specific facts supporting such claim …."); *Liberty Mut. Ins. Co. v. Horizon Bus Co.*, 2011 WL 1131098, *7 (E.D.N.Y. Feb. 22, 2011) (recommending dismissal because "[a]s to any piercing the corporate veil / alter ego theory, the complaint does not comport with the pleading requirements of Rule 8 that the complaint provide a short and plain statement of the claim"); *PNC Bank, Nat'l Ass'n v. Hall*, 2010 WL 3947506, *4 (S.D. Ind. Oct. 7, 2010) ("Claims arising from piercing the corporate veil are subject to the notice pleading standards of Federal Rule of Civil Procedure 8(a). … Plaintiff does not plead any facts suggesting a connection between Hall and ICOE. … The Court therefore concludes that Plaintiff's pleadings do not provide adequate notice to Hall of Plaintiff's intent to rely on a theory of piercing the corporate veil."); *Coeur D'Alene Tribe v. Asarco Inc.*, 2000 WL 34023645, *5 (D. Idaho June 2, 2000) (opining that "it is difficult for the Court to believe the Defendants were on notice of USA's corporate veil piercing theory at the time the Complaint was filed"); *see generally Culp v. Economy Mobile Homes, Inc.*, 895 So.2d 857, 860 (Ala. 2004) ("In their complaint, the Culps alleged that Rustin used Free State Homes Manufacturing, Inc., as a sham to avoid personal liability. Therefore, the Culps stated a claim to pierce the corporate veil of Free State Homes Manufacturing, Inc., and to impose personal liability on Rustin personally."); *Forester & Jerue, Inc. v. Daniels*, 409 So.2d 830, 832 (Ala. 1982) (reversing summary judgment against individual defendants where, *inter alia*, "[t]he complaint in the present action did not allege that [they] were the alter ego of the corporation or any other cognizable action for personal liability").

[17]    Nor did the applicable Report of Parties' Planning Meeting (doc. 18) contain any clues that Northstar sought to hold Michael Huffman liable for the alleged misconduct and contract breaches of Huffman Construction, Inc., pursuant to its belief that the corporate form may be disregarded to reach Huffman personally.

proper, permissible vehicle for a *de facto* amendment to the pleadings. *See, e.g., American Federation of State, County and Mun. Employees Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment or one advocating summary judgment.") (citation and internal quotation marks omitted); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."). Accordingly, defendants' objection to plaintiff's attempt to inject the concept of piercing the corporate veil in this action via its summary judgment brief, when it is not set forth in the Complaint as required under Rule 8(a), is well founded.[18]

Returning to movants' original summary judgment argument, defendants have asked for Rule 56 relief as to Northstar's claims against Michael Huffman because "[t]here is no evidence of individual liability as against Huffman." (Doc. 66, at 27.) Plaintiff's only response to this contention was to rely on the doctrine of piercing the corporate veil (*see* doc. 73, at 7-8), which this Court has now held not to be properly pleaded in the Complaint and therefore not to be joined in this lawsuit. Northstar has identified no other facts, evidence, or argument that might support any of its claims against Michael Huffman in his individual capacity. Because plaintiff has elected to hang its hat exclusively on a legal theory that is not part of this case, the Motion for Summary Judgment is **granted** as to plaintiff's claims against defendant Michael Huffman.

### C. *Defendants' Counterclaim for Money Owed.*

Finally, Huffman Construction moves for summary judgment as to liability for its counterclaim against Northstar. The counterclaim centers on Huffman Construction's contention that Northstar failed to pay more than $400,000 in invoices for labor and equipment provided by Huffman Construction to Northstar pursuant to the May 26 Agreement. In seeking summary judgment on this claim, Huffman Construction relies on Risko's deposition testimony. When asked whether he agreed or disagreed with Huffman Construction's claim that Northstar had

---

[18] Additionally, it bears noting that the Rule 16(b) Scheduling Order's deadline for amending pleadings expired in June 2013. Northstar having successfully insisted that this deadline be enforced strictly against Huffman / Huffman Construction when defendants sought to supplement their Answer to include additional affirmative defenses, it can hardly be heard to cry foul when defendants return the favor now.

underpaid it in the amount of $408,000, Risko testified, "I disagree with that amount. … It's approximately 200." (Risko Dep., at 32-33.) Risko's testimony left no ambiguity on this point. He acknowledged that Northstar owed Huffman Construction approximately $200,000 under the May 26 Agreement as of September 2010, but that he and Huffman had elected to offset that amount against the larger sum that Huffman Construction owed Northstar pursuant to the 10% finder's fee agreement. (*Id.* at 30.) Because Risko has admitted that Northstar in fact owes money to Huffman Construction, the latter's Motion for Summary Judgment is meritorious as to the liability portion of the counterclaim for money owed.

In so concluding, the Court has considered and rejected Northstar's two cursory arguments against this aspect of the Motion for Summary Judgment. First, Northstar states in conclusory terms that Huffman Construction "is subject to Alabama's door-closing statute and is unable to pursue any claims against Plaintiff." (Doc. 73, at 9.)[19] Presumably, Northstar is referring to the Alabama statute that provides as follows: "A foreign entity transacting business in this state … may not maintain any action, suit, or proceeding in any court of this state until it has registered in this state." Ala. Code § 10A-1-7.21(a). A threshold defect with plaintiff's argument is that the statute on its face only bars a foreign entity from maintaining suit in Alabama "until it has registered in this state."[20] Northstar's own summary judgment exhibits confirm that Huffman Construction filed its Application for Certificate of Authority of a Foreign Corporation to Transact Business in Alabama back in February 2011, and filed a Registered Agent Change in the Office of the Secretary of State of Alabama in September 2011. (Doc. 73, Exh. J.) By all appearances, then, Huffman Construction is registered to transact business in

---

[19] Unhelpfully, Northstar neglects even to cite the relevant Alabama statute, much less to explain in any meaningful sense how it might apply to preclude Hoffman Construction's counterclaim. The sum total of Northstar's analysis and argument pertaining to the door-closing statute is a single sentence in its brief. To compound the confusion, Huffman Construction cites the Alabama door-closing statute as being Alabama Code § 10-2A-247 (*see* doc. 78, at 12); however, that code section was repealed in 1994.

[20] *See generally CS Assets, LLC v. H & H Real Estate Development, Inc.*, 353 F. Supp.2d 1187, 1187-88 (N.D. Ala. 2005) ("The plain language of the provision provides that the bar against maintaining suits applies only 'until' the foreign LLC registers. … Thus, under a plain reading of the section, the provision imposes no bar to 'maintaining' an action *after* registration.").

Alabama today, in which case the door-closing statute would pose no impediment to its ability to maintain the Counterclaim against Northstar.

Even if Huffman Construction were now unregistered and subject to § 10A-1-7.21(a) (which it is not), the Alabama Supreme Court has observed that "the door-closing statute is not applicable to actions by foreign entities that involve interstate commerce." *Wausau Development Corp. v. Natural Gas & Oil*, --- So.3d ----, 2013 WL 6150798, *2 (Ala. Nov. 22, 2013). Under any reasonable assessment, Huffman Construction's counterclaim for money owed based on work that it performed in Louisiana and elsewhere pursuant to a contract with Northstar (a New Jersey corporation) involves interstate commerce, and is therefore plainly beyond the scope of the statute. Northstar has made no argument or showing to the contrary.

Second, Northstar balks that "Plaintiff has not admitted that it owes any money to Defendants" and that "Defendants read the testimony of Risko out of context." (Doc. 73, at 9.) The record reflects otherwise. A plain reading of Risko's testimony shows that he admitted (i) Northstar did not pay a six-figure invoice submitted by Huffman Construction pursuant to the May 26 Agreement, and (ii) the amount of that invoice was "owed" by Northstar to Huffman Construction. Northstar identifies no evidence – and the summary judgment record does not support a reasonable inference – that Huffman Construction did not actually perform the services summarized in that invoice, that Northstar was not obligated by the terms of the May 26 Agreement to pay that invoice, that the amount of that invoice did not represent sums properly due and payable by Northstar to Huffman Construction, or that Northstar ever paid that amount. To be sure, Northstar points to evidence that the parties agreed to offset the amount of Northstar's indebtedness to Huffman Construction against the much larger amount of Huffman Construction's indebtedness to Northstar (which, of course, was never paid, so the offset never happened). Be that as it may, such an arrangement does not erase the undisputed fact of Northstar's indebtedness to Huffman Construction on the underlying invoice. No genuine issues of material fact remain on that question; therefore, summary judgment is properly granted on the question of Northstar's liability to Huffman Construction on the counterclaim for money owed.[21]

---

[21] To be clear, the question of damages (if any) on the counterclaim remains a triable issue in this case. The parties dispute whether the amount of Northstar's indebtedness to Huffman Construction is approximately $200,000 or approximately $400,000. And they dispute whether Huffman Construction has any indebtedness to Northstar (*i.e.*, pursuant to the oral (Continued)

**IV. Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendants' Motion for Summary Judgment (doc. 52) is **granted in part**, and **denied in part**;

2. The Motion is **granted** as to plaintiff's claims against the individual defendant, Michael Huffman. All such claims are **dismissed**, and the Clerk of Court is directed to **terminate** Michael Huffman as a party defendant;

3. The Motion is likewise **granted** in Huffman Construction's favor as to Northstar's liability on the Counterclaim for money owed. The Court finds as a matter of law that Northstar is liable to Huffman Construction on said Counterclaim, with the amount of damages (and any offset against amounts that Huffman Construction may be found to owe Northstar) to be fixed by the trier of fact at trial;

4. In all other respects, the Motion is **denied**; and

5. This action remains set for Final Pretrial Conference before the undersigned on **October 14, 2014** at **2:00 p.m.**, with non-jury trial to follow during the **November 2014** civil trial term.

DONE and ORDERED this 29th day of September, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

agreement for the 10% fee), against which Northstar's indebtedness on the invoice might be offset. Those issues remain fully in play and will be decided at trial. What this ruling on defendants' Motion for Summary Judgment takes off the table for trial is simply the question of whether Northstar is liable to Huffman Construction for unpaid funds under the terms of the May 26 Agreement. Liability has been established by Risko's own admissions. If plaintiff prevails at trial on its claims against Huffman Construction, then plaintiff will be entitled to offset the damages award on Huffman Construction's counterclaim against the damages award for its claims against Huffman Construction. By contrast, if Northstar loses at trial on its claims against Huffman Construction, then judgment will be entered against Northstar on Huffman Construction's counterclaim in an amount to be determined at trial. Either way, the parties need not waste time at trial by presenting evidence relating to Northstar's liability on the Counterclaim, because no genuine issues of fact exist as to the existence of such liability.