IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **NORTHSTAR MARINE, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION 13-0037-WS-C |
| ) | |
| **HUFFMAN CONSTRUCTION, INC.,** ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This matter came before the Court for non-jury trial on November 19, 2014.  Pursuant to Rule 52(a)(1), Fed.R.Civ.P., the Court now finds the facts specially and states its conclusions of law separately.

**I.    Preliminary Matters.**

   *A.    Nature of the Dispute.*

This action arises from a commercial dispute between two entities that were involved in the lucrative business of cleaning up the Gulf of Mexico oil spill caused by the explosion of the DEEPWATER HORIZON drilling platform in April 2010.  Plaintiff, Northstar Marine, Inc. ("Northstar"), claims that it entered into an oral agreement with defendant, Huffman Construction, Inc. ("Huffman Construction").  According to Northstar, the terms of such oral contract were that Northstar agreed to introduce Huffman Construction to the National Response Corporation ("NRC") as a direct contractor, in exchange for Huffman Construction paying Northstar a finder's fee of 10% of its gross invoices billed to and paid by NRC.  Huffman Construction denies that any such deal was ever struck.  For its part, Northstar alleges that Huffman Construction failed and refused to honor this agreement, even as Huffman Construction collected nearly $10 million in direct billings from an NRC contract obtained through Northstar's good graces.  On this basis, Northstar asserts state-law claims against Huffman Construction for breach of contract, unjust enrichment, conversion, and fraud, negligent and/or reckless misrepresentation.  Pursuant to the Joint Pretrial Document (doc. 84), Northstar

demands judgment from Huffman Construction in the amount of $915,904, plus interest and costs.

Also joined in this action is Huffman Construction's counterclaim against Northstar for money owed. Huffman Construction claims that Northstar failed and refused to pay it certain funds due and owing for oil spill response services provided under a subcontract agreement. On September 29, 2014, the undersigned entered an Order (doc. 83) granting Huffman Construction's motion for summary judgment as to liability on its counterclaim. That Order held that "Northstar is liable to Huffman Construction on said Counterclaim, with the amount of damages (and any offset against amounts that Huffman Construction may be found to owe Northstar) to be fixed by the trier of fact at trial." (Doc. 83, at 20.) Thus, the only remaining issue for trial as to the counterclaim is the amount of damages to which Huffman Construction is entitled. Huffman Construction pegs that figure at $385,773.60, while Northstar contends that the proper sum is actually $194,050.

### B. *The Record / Matters Considered.*

The triable issues of law and fact joined in this matter are as delineated in the Joint Pretrial Document (doc. 84), and incorporated in the Order on Pretrial Conference (doc. 88). In resolving such triable issues, the Court has reviewed and considered the following: (i) all witness testimony and exhibits admitted into evidence at the bench trial conducted on November 19, 2014; (ii) defendant's designations from the transcript of the first Chris Eilers deposition conducted on June 3, 2014, as attached to a letter from defendant's counsel received by the undersigned's chambers on December 3, 2014, plus plaintiff's counter-designations as set forth in Section G of the Joint Pretrial Document;[1] (iii) the transcript and video recording of the entire deposition of Johnny Slaughter, conducted on October 29, 2014, as attached to a letter from defendant's counsel received by the undersigned's chambers on December 9, 2014;[2] and (iv) the

---

[1]   This deposition transcript was mentioned by defendant's counsel at the outset of its case in chief. Plaintiff's counsel agreed to the admission of that transcript, subject to the proviso that the portions of such transcript it had designated in the Joint Pretrial Document also be admitted. Pursuant to that stipulation, the Court accepted those designated portions of the transcript. Unfortunately, the marked-up copy mailed by defendant's counsel omits an exhibit sticker. For identification, that document will be labeled Defendant's Exhibit 90.

[2]   The Court accepts the Slaughter deposition transcript and recording in their entirety, without regard to particular designations by defendant's counsel. The Court does so (Continued)

video recording of the second Chris Eilers deposition conducted on November 13, 2014, as attached to defendant's counsel's letter to chambers received on December 9, 2014.[3]  By written Notices (docs. 96 & 97) submitted after trial, both sides disclaimed any intent or desire to put additional exhibits or evidence before the Court.  Therefore, the above-referenced materials constitute the universe of evidence that the Court has considered for purposes of making the findings of fact and conclusions of law set forth herein.

## II.     Findings of Fact.

### A.     *Northstar's Relationship with NRC.*

Plaintiff, Northstar Marine, Inc., is a New Jersey-based company in the business of providing marine and environmental services, including without limitation work boats, barges and tugboats for oil spill cleanup projects.  One entity for which Northstar provides such services is National Response Corporation ("NRC"), which is akin to a general contractor for oil spill cleanup.  Northstar has been a part of NRC's network of contractors since the early 1990s and has responded to approximately 30 oil spill events pursuant to its NRC contracts over the years.  By virtue of that extensive history of dealings, Northstar and its president, Phil Risko, have developed close working relationships with NRC officials.

At all relevant times, Northstar's compensation arrangement with NRC was that Northstar would submit a "rate sheet" each year, itemizing prices for labor, equipment, and boats that it could provide in connection with an oil spill response effort.  Following NRC approval of that rate sheet, it would remain in effect for a term of one year, and would govern Northstar's compensation from NRC.  To obtain response resources upon NRC request in the event of an oil

---

because plaintiff's counsel appears not to have had a reasonable opportunity to submit counter-designations before the exhibit's submission (*see* doc. 98), and because the entire Slaughter deposition spans just 26 pages and 31 minutes.  Once again, defendant submitted these materials without exhibit stickers.  For identification, the Slaughter deposition transcript will be labeled Defendant's Exhibit 91, and the accompanying DVD will be labeled Defendant's Exhibit 92.

[3]    The transcript of the second Eilers deposition was previously admitted into evidence as Plaintiff's Exhibit 30.  The Court will consider both the DVD (which did not bear an exhibit sticker when submitted by defendant's counsel, but which will be labeled Defendant's Exhibit 93) and the transcript of the second Eilers deposition in their entirety, without regard to specific designations or counter-designations by the parties.

spill, Northstar worked with literally dozens of subcontractors, in addition to providing certain boats, equipment and labor itself.

### B.     The BP Oil Spill.

In April 2010, the DEEPWATER HORIZON drilling platform exploded, causing a massive oil spill in the central Gulf of Mexico (the "BP Oil Spill").  NRC and Northstar became heavily involved in the cleanup efforts.  A command center was established in the Mobile Convention Center in Mobile, Alabama to facilitate effective deployment of response resources in what became an evolving crisis of unprecedented size and scope.  Phil Risko (on behalf of Northstar) and various representatives of NRC (including an assistant logistics manager named Chris Eilers) were among those stationed at the command center.  As the crisis unfolded over a period of weeks, NRC would receive requests from the field for manpower, resources, vessels, equipment and the like, and would in turn look to contractors such as Northstar to fill those requests in a prompt and efficient manner.  In fact, Risko was literally sitting at a table with Eilers, other NRC representatives, and other contractors, fielding requests for vessels, operators, equipment and so on as they filtered in to the command center.  The atmosphere was both chaotic and stressful, as Northstar and other contractors faced mounting NRC pressure and struggled to accommodate burgeoning requests for response resources, even as available resources became increasingly depleted and difficult to secure in the face of dwindling inventories and overtaxed supply chains.

As a result of these forces, Northstar's response operation in connection with the BP Oil Spill quickly mushroomed, to the point where Northstar was working with approximately 50 subcontractors as of June 2010.  This state of affairs created significant practical difficulties for Northstar, as the company's office staff confronted burdens in terms of back-of-the-house functions, such as keeping up with the processing and auditing of invoices and worksheets from its numerous subcontractors on a daily basis.  The volume of paperwork and the management of this expansive network of subcontractors eventually became so daunting that Northstar had second thoughts about continuing on such a path for its business operations.  By mid-June 2010, Northstar officials were feeling overwhelmed; in particular, Risko became concerned that if Northstar continued to add to its stable of subcontractors, it might compromise its ability to maintain any of them.

### C. Northstar's Subcontractor Relationship with Huffman.

One of Northstar's numerous subcontractors on the BP Oil Spill was Huffman Construction, Inc., a Texas-based company owned by Michael Huffman ("Huffman") and his mother, Cynthia Huffman. Northstar had no previous working relationship or history of dealings with Huffman Construction; however, a Texas-based company called Cotton Commercial USA had previously entered into a subcontractor agreement to provide response resources for Northstar in Cocodrie, Louisiana for the BP Oil Spill. Within days after Cotton entered into the Northstar subcontract for the Cocodrie work, Cotton handed off the project to Huffman Construction, with which Cotton had had a pre-existing working relationship for approximately one or two years.[4] Huffman Construction was allowed to take over the contract, subject to the conditions that it could not replace any vessels or personnel that Cotton already had on the job, and that it must honor the rate sheet that was already in place. Among the personnel previously assigned to Cocodrie were subcontractors Warren Claybar and Halley Moor. Huffman Construction subsequently worked with both Claybar and Moor at that location.

On or about May 26, 2010, Northstar and Huffman Construction entered into a written contract styled "Agreement to Provide Response Resources" (the "May 26 Agreement"). This Agreement included recitals specifying that "Northstar desires to expand its access to response[] resources by establishing subcontractor agreements;" that Huffman Construction "owns, controls or has contracted for [certain] personnel, equipment, supplies or other response resources;" and that Huffman Construction "has agreed to make available to Northstar the Specified Resources." (Plaintiff's Exh. 1, at 1.) Elsewhere in the May 26 Agreement, Huffman Construction agreed to accept Northstar's then-existing rate schedule with NRC. With regard to compensation, Huffman Construction "agrees to use [Northstar] rates from rate sheet enclosed less 15%," and "[n]o additional compensation or commission will be provided." (*Id.* at 7.) Nothing on the face of the May 26 Agreement confined it to the Cocodrie project or any other specific job site.

Two other sets of provisions in the May 26 Agreement are particularly relevant to this litigation. First, Paragraphs 10 and 11 set forth payment arrangements, and explained that

---

[4] According to Cotton representative Johnny Slaughter, Cotton turned the project over to Huffman Construction almost immediately because Cotton was busy in other locations performing other work and did not wish to comply with the additional insurance requirements for working on the BP Oil Spill at that location.

Northstar's payments to Huffman Construction were "subject … to payments to Northstar by [NRC] and approval of invoices by Northstar," with payouts to Huffman Construction being limited to "the approved individual invoice amount."  (*Id.*, ¶¶ 10-11.)  What the plain language of these provisions means is that Northstar was only obliged to pay Huffman Construction for billings that had been approved and paid by NRC.  Thus, to the extent that NRC might disallow any particular amounts from Huffman Construction's invoices, Northstar was not contractually obliged to pay those disallowed sums to Huffman Construction from its own pocket.

Second, the May 26 Agreement included a clause specifying that "[n]o amendment of this Agreement shall be effective or binding unless in writing and executed by both Northstar and [Huffman Construction]'s respectively duly authorized representatives."  (*Id.*, ¶ 18.)  No written amendment of the May 26 Agreement was ever executed by Northstar and Huffman Construction.

With regard to Huffman Construction's work for Northstar on the Cocodrie project pursuant to the May 26 Agreement, Northstar collected from NRC the sum total of $3,776,960.  (Northstar had billed NRC a total of $4,079,085 on the project, with the difference being attributable to NRC write-downs, disallowances and adjustments totaling $302,125.)  Bearing in mind that Huffman Construction was to be paid at 85% of Northstar's NRC-approved rates, Northstar was required to pay Huffman Construction the sum total of $3,210,416 (or $3,776,960 x 0.85).[5]  By stipulation, the parties have agreed that the actual amount that Northstar paid

---

[5]  Of course, the amount actually billed by Huffman Construction to Northstar was more than $3,210,416, with defendant offering testimony at trial that Huffman Construction's total billings to Northstar were $3,402,140.41.  However, that figure would be relevant to defendant's counterclaim only if Huffman Construction were entitled to payment of all billings to Northstar, regardless of whether Northstar was actually paid in full by NRC for those invoices.  Stated differently, the $3,402,140.41 figure touted by Huffman Construction fails to account for write-downs, adjustments, or disallowances of its invoices by NRC.  If the latter figure is used in calculating the amount owed by Northstar to Huffman Construction under the contract, the difference between billings and payments is approximately $385,000.  If, however, Huffman Construction's compensation is tied to actual receipts by Northstar rather than total billings by Huffman Construction, then the difference between collections for and payments to Huffman Construction shrinks to approximately $194,000.  It is a matter of contract interpretation whether Huffman Construction or Northstar bears the risk of NRC disallowances or adjustments of particular invoices.  The Court reads the contract as not entitling Huffman Construction to compensation for NRC markdowns of its invoices.  Indeed, the May 26 Agreement does not reasonably admit to any other construction of the parties' payment terms and conditions.

Huffman Construction on the contract was $3,016,366. After the dispute arose between Northstar and Huffman Construction over the alleged "finder's fee" that Northstar claimed Huffman Construction owed it, Northstar held back certain funds it admittedly owed Huffman Construction under the May 26 Agreement for the Cocodrie subcontract job, seeking leverage as to the the finder's fee issue. When the finder's fee issue ripened to litigation between the parties, Huffman Construction counterclaimed against Northstar for the unpaid balance on the Cocodrie job, with the parties' only disagreement being what the actual unpaid balance is.

### D.     *Huffman Construction's Direct NRC Contract.*

As stated previously, by June 2010, Northstar found itself overwhelmed by escalating NRC demands for additional BP Oil Spill response resources, at a time when Northstar's office staff were experiencing heavy workload and Northstar's ability effectively to manage its stable of subcontractors was in jeopardy. When NRC requested yet more resources from Northstar in mid-June 2010 (this time in the form of 20 additional vessels, operators and deckhands), Risko proposed an alternative arrangement. In particular, Risko suggested that Northstar refer NRC to another contractor to enter into a direct contractual relationship with NRC to fulfill this latest request. NRC was receptive to this plan.

Because of Northstar's longstanding relationship with NRC spanning nearly two decades, Northstar was uniquely situated to recommend direct contractors to NRC. Risko believed that NRC would likely follow his recommendation of a specific direct contractor with little question or hesitation, particularly given the urgency and chaos of the evolving massive BP Oil Spill cleanup project; moreover, Chris Eilers of NRC admitted that Northstar's recommendation was a factor in its decision to bring on certain contractors. What's more, Risko and Northstar had an opportunity to exercise such influence because Risko was quite literally sitting at a table with Eilers and others in the BP Oil Spill command center in Mobile, Alabama, fulfilling requests for response resources as NRC made them. Thus, when it came to making recommendations for direct contractors to work with NRC, Northstar had the twin advantages of a favorable reputation (borne of its close working relationship with NRC spanning many years) and a seat at the decision-making table alongside the relevant NRC officials.

Risko's initial plan was to refer NRC to a company called Lily Contractors (which was owned by Warren Claybar and with which Rian Glasscock was consulting and sharing the profits on this project). Lily Contractors worked with both Northstar and Huffman Construction on the

BP Oil Spill cleanup, with Lily providing boats, equipment and labor.  Northstar was pleased with Lily's work on the BP Oil Spill response thus far, so Risko approached Glasscock and Claybar about the idea of Lily entering into a direct contract with NRC, rather than as a Northstar subcontractor, for the additional 20 vessels, operators and deckhands that NRC sought.  Risko emphasized the importance of Lily being able to provide the boats and to perform great work for NRC, if he was going to put Northstar's reputation on the line by recommending that company.  Risko also explicitly told both Glasscock and Claybar that Northstar would request a fee of 10% of their gross income from NRC for facilitating Lily's direct contractor relationship with NRC.  Glasscock and Claybar readily agreed.  A short time later, however, Claybar notified Risko that Lily might encounter difficulties complying with NRC insurance requirements.  To address this concern, Claybar proposed that the direct NRC contract run through Huffman Construction (with which Glasscock and Claybar were already working on the Cocodrie project) instead of Lily.  Under this formulation of the plan, Glasscock and Claybar would have precisely the same role vis a vis the NRC deal; however, for insurance purposes, the direct contracting entity would be Huffman Construction, and not Lily.[6]

Upon hearing this idea, Risko contacted Michael Huffman of Huffman Construction. (Glasscock had already spoken with Huffman to gauge his interest.)  In the ensuing conversation, Risko explained that Northstar could recommend that NRC retain Huffman Construction as a direct contractor, that NRC would likely follow his recommendation, and that Northstar would want a fee of 10% of the gross invoices for which Huffman Construction was actually paid on the NRC direct work deal.  Huffman responded that Glasscock and Claybar had already told him about the 10% fee, and that such an arrangement would be fine.  Risko then spoke with Chris Eilers at NRC and explained the proposed arrangement with Huffman Construction.  Eilers was agreeable to this proposal, and NRC and Huffman Construction proceeded to work out the terms of a direct contract between themselves for Huffman Construction to provide response resources directly to NRC.  Without Risko and Northstar's recommendation and introduction, it appears

---

[6]      Another person, Halley Moor of the contracting firm Jones and Moor, was also working for Huffman Construction in Cocodrie at this time pursuant to an oral agreement.  Moor was involved with Glasscock and Claybar in presenting the direct contract idea to Huffman Construction, and contemplated using his contacts to make additional boats available for Huffman Construction to perform any NRC direct contract it might receive.

highly improbable that Huffman Construction could or would have obtained such a direct contract with NRC for work on the BP Oil Spill cleanup project.

The 10% finder's fee arrangement between Northstar and Huffman Construction was never reduced to writing. Although such an omission might appear suspect, taken in context it actually made sense. In the rapidly evolving, chaotic, pressure-packed, dynamic scenario unfolding with the BP Oil Spill cleanup, contractors were flooded with paperwork and deals (even agreements bearing huge dollar values) were sometimes made on the fly with a handshake and a smile. There was ample trial testimony that such oral agreements were not unusual in this industry, particularly during the first frenzied weeks and months of the BP Oil Spill response effort. Moreover, Northstar did not anticipate that Huffman Construction's direct contract with NRC would swell to the duration or volume that it ultimately reached, and certainly did not expect Huffman Construction to collect nearly $10 million from NRC under that direct contract. Nonetheless, despite the absence of a writing, Huffman repeatedly acknowledged in conversations with Glasscock, Moor and Risko that Huffman Construction had agreed to pay Northstar 10% off the top of the funds it received from NRC pursuant to the direct contract.[7]

---

[7] Contrary to defense counsel's suggestion at trial (in arguing that no such agreement was ever made), this was not a foolhardy deal from Huffman Construction's perspective. Recall that under the Northstar subcontract, Huffman Construction was getting paid at only 85 cents on the dollar for approved invoices, without having any control over money, invoices, etc. By entering into a direct contract with NRC (subject to the 10% finder's fee), Huffman Construction effectively upped its reimbursement rate to 90 cents on the dollar for approved services, and gained control over funds, invoices and projects that it never had before. Again, there was evidence at trial that Huffman Construction never could have gotten such a direct deal with NRC without the influence and clout of Northstar; thus, by all appearances, the 10% deal was a quite favorable and advantageous one for Huffman Construction. Likewise, from Northstar's perspective, it made sense to bargain for compensation for the exercise of influence over NRC by requesting a finder's fee as a prerequisite for any recommendation it gave to another contractor for such a direct deal. Testimony was unequivocal that Risko made clear from initial conversations with Glasscock and Claybar that he would insist on a 10% arrangement to recommend their company. Of course, Claybar's company ultimately bowed out from consideration for the NRC direct contract, paving the way for Huffman Construction. Under the circumstances, it would defy common sense for Risko to have omitted mention of the 10% fee to Huffman after having been so upfront and emphatic to Glasscock and Claybar about it just days before when the prospective contractor was Lily Contractors rather than Huffman Construction. Finally, defendant's failure to act diligently to pursue the funds that Northstar admittedly owed it under the May 26 Agreement becomes understandable when taken in the context of Huffman Construction owing Northstar a much larger sum on the 10% deal.

### E. Huffman Construction's Refusal to Pay 10% Finder's Fee.

By the fall of 2010, Northstar still had not received any of the promised 10% payments from Huffman Construction. When Risko contacted Huffman about this outstanding matter, Huffman responded that Northstar was holding back $200,000 that it owed Huffman Construction for the Cocodrie subcontract, and that Huffman Construction would pay Northstar the difference as soon as NRC paid Huffman Construction. Thereafter, Huffman stopped accepting telephone calls from (and severed all communications with) Risko / Northstar.

To date, Huffman Construction has failed and refused to pay a cent of the 10% fee to Northstar. This is so, even though the parties have stipulated and agreed that NRC ultimately paid Huffman Construction the sum of $9,159,039.77 on the direct contract. Ten percent of that figure would be $915,903.98.

### III. Conclusions of Law.

#### A. Count One (Breach of Contract).

Northstar has asserted four overlapping causes of action against Huffman Construction. Count One is a claim for breach of contract. "In order to establish a breach-of-contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *City of Gadsden v. Harbin*, 148 So.3d 690, 696 (Ala. 2013) (citations omitted).

Under applicable law, "[a] contract cannot be formed without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract." *Ex parte Payne*, 741 So.2d 398, 403 (Ala. 1999). "To be enforceable, the essential terms of a contract must be sufficiently definite and certain, … and a contract that leaves material portions open for future agreement is nugatory and void for indefiniteness." *White Sands Group, LLC v. PRS II, LLC*, 998 So.2d 1042, 1051 (Ala. 2008) (citations and internal marks omitted); *see also Capmark Bank v. RGR, LLC*, 81 So.3d 1258, 1268 (Ala. 2011) (similar). "[I]n order for an alleged contract to be considered void based on the indefiniteness of its terms, the indefiniteness must reach the point where construction becomes futile." *Poole v. Prince*, 61 So.3d 258, 275 (Ala. 2010) (citations and internal marks omitted).

The Court concludes that all prerequisites for contract formation were present here. There was an offer, an acceptance, consideration and mutual assent to essential terms, as

between Northstar and Huffman Construction. Contrary to Huffman Construction's argument, the parties' oral agreement was not void for indefiniteness. The Court concludes that Northstar and Huffman Construction intended to enter into a binding contract under which Northstar would recommend Huffman Construction for a direct contract with NRC in exchange for Huffman Construction paying Northstar 10% of its gross receipts on the NRC direct contract. The terms of that agreement were not so vague and indefinite that construction of the contract would be futile; to the contrary, the terms of that agreement provide a reasonable "basis for determining the existence of a breach and for giving an appropriate remedy." *Poole*, 61 So.3d at 275 (emphasis and citation omitted). Thus, there was a valid contract binding Northstar and Huffman Construction. Northstar performed its obligations under the contract. Huffman Construction did not. The Court thus finds that Huffman Construction breached its contract with Northstar, and that Northstar's damages are 10% of Huffman Construction's gross receipts from the direct NRC contract, or $915,903.98.[8]

### B.     *Counts Two through Four (Unjust Enrichment, Conversion, Fraud).*

The triable issues presented by the parties in their Joint Pretrial Document also include Northstar's claims against Huffman Construction for unjust enrichment (Count Two), conversion (Count Three), and fraud/misrepresentation (Count Four). These claims appear to have been included as mere afterthought, given the scant attention and meager development the parties

---

[8] At trial, Huffman Construction suggested that the oral agreement for a 10% finder's fee was void pursuant to the May 26 Agreement's provision that "[n]o amendment of this Agreement shall be effective or binding unless in writing and executed by both Northstar and [Huffman Construction]'s respectively duly authorized representatives." This argument is unavailing because the 10% finder's fee agreement was not an amendment to the May 26 Agreement, but was a separate agreement covering different subject matter. The stated purpose of the May 26 Agreement was for Huffman Construction to act as a subcontractor to Northstar and to make certain response resources available to Northstar. By contrast, the oral agreement had nothing to do with any subcontractor arrangement between Northstar and Huffman Construction and did not concern Huffman Construction providing response resources to Northstar; rather, the oral agreement related to Northstar enabling Huffman Construction to provide response resources directly to NRC in exchange for a finder's fee. Accordingly, the Court concludes that the oral agreement for the 10% finder's fee was not an amendment of the May 26 Agreement and therefore was not subject to the requirement that all amendments to the May 26 Agreement must be in writing.

afforded them in the Joint Pretrial Document and at trial.  Nonetheless, the Court now enters conclusions of law with respect to each such cause of action.

Count Two sounds in a theory of unjust enrichment.  "[T]o prevail on a claim of unjust enrichment, the plaintiff must show that the defendant holds money which, in equity and good conscience, belongs to the plaintiff." *Mantiply v. Mantiply*, 951 So.2d 638, 654 (Ala. 2006); *see also Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So.3d 139, 145 (Ala. 2011) ("To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation.") (citations omitted).  Enrichment may be "unjust" for purposes of this doctrine if "the donor of the benefit … acted under a mistake of fact or in misreliance on a right or duty." *Mantiply*, 951 So.2d at 654-55.  The Court concludes that Northstar has shown by a preponderance of the evidence that Huffman Construction is holding money which, in equity and good conscience, belongs to Northstar.  Moreover, Northstar conferred a benefit on Huffman Construction in misreliance on a right or duty, and with a reasonable expectation of compensation.  Accordingly, the Court finds for plaintiff on Count Two and will enter judgment in Northstar's favor on that claim in the amount of the unjust enrichment ($915,903.98).

Count Three is a claim for conversion.  Alabama law provides a cause of action for conversion in circumstances involving "a wrongful taking or a wrongful detention or interference, an illegal assumption of ownership, or an illegal use or misuse of another's property. … The gist of the action is the wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has general or special title to the property or the immediate right to possession." *Schaeffer v. Poellnitz*, --- So.3d ----, 2014 WL 2241913, *7 (Ala. May 30, 2014) (citations and emphasis omitted).  Here, the ostensibly "converted" property consists of the funds that Huffman Construction owes Northstar.  However, "[t]he Alabama Supreme Court has repeatedly held that an action for the conversion of money is improper unless there is earmarked money or specific money capable of identification." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1304 (11th Cir. 2010) (citations omitted).  "Money is specific and capable of identification where, for example, it is money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money *rather than to merely*

*deliver a certain sum.*"  *Id.* (citations and internal quotation marks omitted).  Here, Northstar claims conversion not of any specific money capable of identification, but merely of a certain sum it says is owed; therefore, its conversion cause of action is legally infirm on its face.[9]  Judgment will be entered in favor of defendant on Count Three.

Finally, Count Four is framed as a claim for fraud, negligent and/or reckless representation.  "The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.  To prevail on a promissory fraud claim … based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive." *Mantiply*, 951 So.2d at 653 (citations omitted).  The Court concludes that Northstar has not met its burden of showing by a preponderance of the evidence that Huffman Construction did not intend to pay the 10% finder's fee at the time it entered into the oral agreement with Northstar, or that Huffman Construction acted with an intent to deceive.  Because the elements of promissory fraud are not satisfied here, the Court finds that Northstar shall have and take nothing on Count Four, and will enter judgment in favor of Huffman Construction on that cause of action.

### C.  *Huffman Construction's Counterclaim.*

With respect to the counterclaim against Northstar for money owed, the Court previously granted summary judgment as to liability in favor of Huffman Construction on this claim.  *See* doc. 83, at 20 ("The Court finds as a matter of law that Northstar is liable to Huffman Construction on said Counterclaim, with the amount of damages (and any offset against amounts that Huffman Construction may be found to owe Northstar) to be fixed by the trier of fact at trial.").  To calculate damages on this counterclaim, the Court concludes that the proper measure

---

[9]  *See, e.g., Selman v. CitiMortgage, Inc.*, 2013 WL 838193, *14 (S.D. Ala. Mar. 5, 2013) ("Absent factual allegations that the money in question was segregated, sequestered or identifiable in some specific way, the Selmans cannot maintain a conversion claim against CitiMortgage based simply on that defendant's failure to deliver a certain sum that plaintiffs contend should have been delivered."); *Johnson v. Life Ins. Co. of Alabama*, 581 So.2d 438, 443 (Ala. 1991) ("an action alleging conversion of money lies only where there is an obligation to deliver the specific pieces of money in question or money that has been specifically sequestered, rather than a mere obligation to deliver a certain sum").

of damages under the May 26 Agreement is the difference between (i) 85% of the amount that Northstar collected from NRC on Huffman Construction invoices, and (ii) the amount that Northstar actually paid Huffman Construction for those invoices.  The Court has made a finding of fact that Northstar collected $3,776,960 from NRC on Huffman Construction invoices, and 85% of that sum is $3,210,416.  Furthermore, by stipulation, the parties have agreed that the actual amount that Northstar paid Huffman Construction on the contract was $3,016,366.  Huffman Construction's damages on the counterclaim are the difference between these two figures, or $3,210,416 - $3,016,366, which equals $194,050.  Judgment will be entered in Huffman Construction's favor on the counterclaim in that amount.

IV.   **Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1. The Court finds for Northstar and against Huffman Construction on plaintiff's claims for breach of contract (Count One) and unjust enrichment (Count Two), and awards damages in Northstar's favor on those claims in the amount of **$915,903.98**;

2. The Court finds for Huffman Construction and against Northstar on plaintiff's claims for conversion (Count Three) and fraud/misrepresentation (Count Four), and Northstar shall have and take nothing on such claims;

3. The Court awards Huffman Construction damages on its counterclaim against Northstar in the amount of **$194,050**; and

4. Offsetting Huffman Construction's damages award on its counterclaim from Northstar's damages award on Counts One and Two yields a net award in favor of Northstar and against Huffman Construction in the amount of **$721,853.98**.  A separate judgment will be entered in favor of Northstar and against Huffman Construction in the amount of **$721,853.98**.

DONE and ORDERED this 6th day of January, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE